IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

STACEY F. BLACKMON,                          )
                                             )
                                             )          Case No.: 08 C 50200
                        Plaintiff,           )
                                             )
                                             )          Hon. P. Michael Mahoney
            v.                               )          U.S. Magistrate Judge
                                             )
MICHAEL J. ASTRUE                            )
Commissioner of Social Security,             )
                                             )
                        Defendant,           )


**MEMORANDUM OPINION AND ORDER**

**I.      Introduction**

        Stacey F. Blackmon seeks judicial review of the Social Security Administration

Commissioner's decision to deny his applications for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the magistrate

judge pursuant to the consent of both parties, filed on December 10, 2008. *See* 28 U.S.C. §

636(c); Fed. R. Civ. P. 73.

**II.     Administrative Proceedings**

        On February 22, 2006, Claimant filed applications for DIB and SSI. (Tr. 126–33.)

Claimant alleges a disability onset date of February 14, 2006 for both DIB and SSI. (Tr. 41,

126–31.) Claimant's applications were denied on May 3, 2006. On July 10, 2006, Claimant filed

a timely Request for Hearing. (Tr. 74.) On October 30th 2007, Claimant appeared and testified at

a hearing before Administrative Law Judge ("ALJ") Cynthia Bretthauer in Evanston, Illinois. (Tr. 7–40.) Claimant was represented by William R. Bue. (Tr. 9.) At the October 30, 2007 hearing, James Radke appeared and testified as the Vocational Expert ("VE"). (Tr. 7.)

On November 28, 2007, the ALJ found that Claimant was not disabled and denied Claimant's applications in turn. (Tr. 48–59.) On December 27, 2007, Claimant submitted a Request for Review along with supporting evidence to the Appeals Council. (Tr. 6.) The Appeals Council denied Claimant's Request for Review on May 30, 2008. (Tr. 1–5.)  Because the Appeals Council denied Claimant's application, the ALJ's decision is considered a final decision of the Commissioner. (Tr. 1–5.) Claimant filed his complaint in federal district court seeking judicial review under 42. U.S.C. §§ 405(g), 1383(c)(3).

## III.   **Background**

Claimant was born on August 6, 1954, making him 51 years old on the alleged onset date of his disabilities and 53 years old at the time of his ALJ hearing. (Tr. 129.) Claimant is 5'10" and weighs approximately 260 pounds. (Tr. 130, 146.) The extent of Claimant's educational background includes his successful completion of high school. (Tr. 137–41, 148, 153.)

At the ALJ hearing, Claimant testified that a typical day for him involves walking outside on his porch and around the block, while remaining in his home for the remainder of the day. (Tr. 24.) Claimant testified that he watches a lot of television and that he has a magazine he reads while at home. (Tr. 27.) If the Claimant has any errands that need to be completed, he has somebody else take care of them for him; usually his next-door neighbor runs his errands for him. (Tr. 24.) Claimant testified that he prepares meals including oatmeal and sandwiches. (Tr. 24.) Claimant also testified that he washes his own dishes. (Tr. 25.) Claimant stated that he can

wash and dress himself without any assistance. (Tr. 24–25.) He attends church every Sunday from 11:00 AM until 2:00 PM. (Tr. 26.) However, Claimant has to get up and stretch in order to stay for the entire time. (Tr. 32–34.) Claimant also testified that he mows the lawn twice a week. (Tr. 34–35.)

Claimant testified that he experiences back pain and his legs begin to swell up with fluid after sitting for too long. (Tr. 21.) To alleviate the pain, Claimant elevates his legs approximately six inches off the floor roughly three times per day. (Tr. 21.) Claimant further testified that he experiences shortness of breath when moving around. (Tr. 22.) He is capable of walking a mile or two but needs to take a break every 15 minutes. (Tr. 23.) Claimant also testified that he can lift five or six pounds, and that he can probably lift 15 pounds without straining. (Tr. 24.)

Claimant previously held employment at a nursing home for 24 years as a food service worker. (Tr. 148.) Claimant also worked as a cook at Our Lady of Victory Foundation Provina from 1995–1996, and as a Supervisor Cook at North Rockford Convalescent Home from 1999–2000. (Tr. 15, 139–140.) Claimant worked as a kitchen supervisor for Lutheran Social Services and Job Corps from 1994–1995. (Tr. 16, 138–139.) Moreover, Claimant has held jobs as a laborer, shipping and receiving clerk, and dishwasher. (Tr. 14–16.) Claimant testified that he could not perform any of his previous jobs as a result of his heart, asthma and back problems. (Tr. 16.) The last time Claimant attempted to work was at Black Hawk Learning Connection; Claimant testified that he was fired from Blackhawk because he could not wash dishes after he became sick. (Tr. 14.) The record indicates that Claimant was employed by Blackhawk from October 2006 until March 2007. (Tr. 213)

IV.   **Medical Evidence**

Claimant underwent an echocardiogram[1] procedure on October 14, 2003 at SwedishAmerican Health System. (Tr. 54.) The results indicated Claimant possessed a severely dilated left ventricular dysfunction with preserved right ventricular function consistent with end stage hypertensive heart disease, a dilated left atrium, and mild to moderate pulmonary hypertension. (Tr. 233.)

On December 15, 2003, cardiologist Jagdeep Sabharwal, M.D., evaluated Claimant. (Tr. 239–240.) Dr. Sabharwal found Claimant to have a dilated cardiomyopathy with a left ventricular ejection fraction of approximately 15%. (Tr. 239–40.) At this meeting, Claimant denied any chest discomfort, shortness of breath, orthopnea, paroxysmal nocturnal dyspnea ("PND"), palpitations, dizziness or any syncopal episodes. (Tr. 239.) However, Claimant indicated that he experiences shortness of breath after walking one block. (Tr. 239.)

On January 26, 2004, Claimant went in for a follow-up evaluation with Dr. Sabharwal. (Tr. 241.) Dr. Sabharwal noted that Claimant did not indicate he was experiencing increased shortness of breath, orthopnea or PND. (Tr. 241.) Claimant had chronic lower extremity swelling that gradually became worse throughout the day. (Tr. 241.) The swelling was generally relieved when Claimant elevated his legs. (Tr. 241.) As of January 26, 2004 Claimant was taking Advair[2],

_____

[1] Echocardiogram (often called "echo") is a graphic outline of the heart"s movement. During this test, high-frequency sound waves, called ultrasound, provide pictures of the heart's valves and chambers. MedicineNet.com, http://www.medicinenet.com/advair/article.htm

[2]Advair is used to prevent asthma attacks. Drugs.com, Advair Information from Drugs.com, http://www.drugs.com/advair.html.

Albuterol Sulfate, Coreg[3], Digoxin[4], Doc-Q-Lace Sodium[5], K-Dur[6], Lasix[7], and Lisinopril[8]. (Tr. 241.)

On March 9, 2004 and September 13, 2004, Claimant went in for follow-up evaluations with Dr. Sabharwal. (Tr. 242–43.) At these meetings, Dr. Sabharwal noted that Claimant denied any increased shortness of breath, orthopnea, PND, chest discomfort, or any significant limitations in his daily activities. (Tr. 242–43.) Moreover, Dr. Sabharwal recommended that Claimant continue with the present medical regime, noting that Claimant was doing quite well on his current medical therapy and that he was not in any significant congestive heart failure. (Tr. 242–43.) On September 21, 2004, Claimant underwent an echocardiogram at Rockford Cardiology Associates. (Tr. 249.) The echocardiogram revealed Claimant had a severely

---

[3]Coreg is used to treat heart failure and hypertension. Drugs.com, Coreg Information from Drugs.com, http://drugs.com/advair.html.

[4] Digoxin is used to treat congestive heart failure. Drugs.com, Digoxin Information from Drugs.com, http://drugs.com/digoxin.html

[5] Docusate is used to treat or prevent constipation, and to reduce pain or rectal damage caused by hard stools or by straining during bowel movements. Drugs.com, Docusate Information from Drugs.com, http://drugs.com/mtm/doc-u-lace.html

[6] K-Dur is used to prevent or to treat low blood levels of potassium (hypokalemia). Drugs.com, K-Dur information from Drugs.com, http://drugs.com/k-dur.html

[7] Lasix treats fluid retention (edema) in people with congestive heart failure, liver disease, or a kidney disorder such as nephrotic syndrome. This medication is also used to treat high blood pressure (hypertension). Drugs.com, Lasix Information from Drugs.com, http://drugs.com/lasix.html

[8]Lisinopril is used to treat high blood pressure (hypertension), congestive heart failure, and to improve survival after a heart attack. Drugs.com, Lisinopril Information from Drugs.com, http://drugs.com/lisinopril.html

depressed left ventricular systolic function with a left ventricular ejection fraction of 20–25% as well as mild aortic insufficiency. (Tr. 249.)

On February 27, 2005, Claimant participated in a sleep study that confirmed a previously diagnosed condition of sleep apnea. (Tr. 250.) At the sleep study, Claimant denied any chest pain, shortness of breath, orthopnea, abdominal pain, heartburn, and tingling or numbness of the extremities. (Tr. 250.)

On September 29, 2005, Claimant went in for a follow-up with Dr. Sabharwal. (Tr. 244.) Claimant did not report experiencing any increased shortness of breath, orthopnea or PND. (Tr. 244.) Additionally, Dr. Sabharwal did not find Claimant with any symptoms or complaints of chest discomfort or major limitations in his daily activities. (Tr. 244.)  Dr. Sabharwal instructed Claimant to continue under the current medical regime. (Tr. 244.)

On October 17, 2005, Claimant went to see Daniel Herdeman, M.D., for the purpose of assessing whether Claimant was an appropriate candidate for a non-thoracotomy defibrillator. (Tr. 245.) Dr. Herdeman determined that Claimant was an appropriate candidate after discovering evidence indicating Claimant had a potential risk for sudden cardiac death and heart failure. (Tr. 245.) Dr. Herdeman determined that Claimant was categorized as a functional class I to II. (Tr. 245.)

On December 19, 2005, Mark Bernstein, M.D., evaluated Claimant's myocardial function. (Tr. 231.) The evaluation revealed that Claimant had normal wall motion and an ejection fraction of 59%. (Tr. 231.) On December 23, 2005, Claimant had a chest x-ray taken; the results showed a stable chest with mild prominence of the left ventricle and mildly atherosclerotic aorta. (Tr. 235.) On December 28, 2005, Claimant underwent surgery of an

Implantable Cardiac Defibrillator ("ICD")[9](also known as a pacemaker). (Tr. 236–238, 255.)

On January 6, 2006, Claimant went in for a follow-up with Tammy J. Boxleitner, CNS. (Tr. 255.) The meeting notes indicate Claimant was doing well. (Tr. 255.) However, Claimant was experiencing some left shoulder discomfort for which he took Tylenol. (Tr. 255.) Claimant denied any dizziness, chest pain, cough, swelling in his lower extremities or bloating in his abdomen, and his blood pressure was well controlled at 120/86. (Tr. 255.)

On February 14, 2006, Claimant went to Heart Management Clinic for a follow-up evaluation. (Tr. 252.) Claimant stated that part of his reason for attending was to request a note allowing him to take short breaks throughout the workday. (Tr. 252.) Jane Steffen, N.P., wrote in her report that Claimant's blood pressure was well within control and that Claimant denied any orthopnea, PND, or dyspnea, cough, heart palpitations, chest pain or pressure, jaw or arm discomfort, dizziness, and peripheral edema. (Tr. 252.) Nurse Steffen also recorded that Claimant reported being so exhausted after work that he had no energy to exercise. (Tr. 252.) The report listed the state of Claimant's asthma to be stable. (Tr. 253.)

On April 6, 2006, a state agency physician, George Andrews, M.D., performed a physical residual functional capacity assessment upon Claimant. (Tr. 258–64.) Dr. Andrews checked the boxes indicating Claimant could occasionally lift or carry 20 pounds, frequently lift 10 pounds, stand, walk, or sit with normal breaks for about six hours in an eight hour day, and that Claimant can push or pull with both his lower and upper extremities. (Tr. 259.) Additionally, Dr. Andrews

---

[9]An implantable cardiac defibrillator (ICD) is a small electronic device installed inside the chest to prevent sudden death from cardiac arrest due to life threatening abnormally fast heart rhythms (tachycardias). MedicineNet.com, Implantable Cardiac Defibrillator Information on Medicinenet.com, http://www.medicinenet.com/implantable_cardiac_defibrillator/article.htm

recorded that Claimant had no postural, manipulative, visual, communicative or environmental limitations. (Tr. 260–62.)

On April 17, 2006, Claimant went for a follow-up evaluation with Nurse Steffen. (Tr. 309.) Nurse Steffen wrote in her report that the staff would like to see Claimant more active and start walking and that there was definitely room for improvement in Claimant's diet as he had been eating improperly. (Tr. 309.) Nurse Steffen also noted that Claimant's blood pressure was 112/86 without his morning medication. (Tr. 309.) Claimant conveyed that he does experience some dyspnea with moderate activity. (Tr. 309.) Claimant denied any cough, heart palpitations, chest pain or pressure, jaw or arm discomfort, loss of appetite, nausea, abdominal bloating or pain, dizziness, fatigue, and any peripheral edema. (Tr. 310.)

On June 8, 2006, Claimant indicated that his asthma was acting up; as a result, he was given prescriptions for Flovent, Singulair, and Albuterol. (Tr. 266.) On June 12, 2006, Claimant went for a follow-up visit with Tammy J. Boxleitner, CNS. (Tr. 306.) Nurse Boxleitner recorded that Claimant's blood pressure was well controlled and that he appeared to be active. (Tr. 306). The nurse also noted that Claimant "[appeared] to be doing well and [had] been stable over the past two months." (Tr. 306.) At the follow-up evaluation, Claimant stated that even though he continues to have shortness of breath with activity, his overall energy level is fine. (Tr. 307.) Claimant also stated that he walks approximately one mile daily and performs yard and housework without fatigue limiting these activities. (Tr. 307.) Nurse Steffen noted that Claimant describes some shortness of breath with exertion and that Claimant remains classified as a Heart Class Functional II-C. (Tr. 307.)

In August 2006, Claimant visited his primary care physician, Abbas Al-Saraf, M.D., who

diagnosed Claimant with non-ischemic cardiomyopathy. (Tr. 349.) Dr. Al-Saraf wrote in his notes that Claimant was capable of performing low-exercise and low-duty jobs. (Tr. 349.)

On October 2, 2006, Nurse Boxleitner indicated, in a follow-up report, that Claimant was doing exceptionally well and that his hypertension, renal function, and asthma were all stable. (Tr. 298.) The report also showed that Nurse Boxleitner did not schedule any follow-up evaluations with the heart clinic stating, "there may be an opportunity to discharge the patient from the clinic." (Tr. 299.)

On December 14, 2006, Claimant met with Dr. Sabharwal for a follow-up visit. (Tr. 295.) Dr. Sabharwal noted, "clinically he is well compensated and not having any significant chest discomfort." (Tr. 295–97.) Dr. Sabharwal noted no significant limitations in Claimant's daily activities. (Tr. 295–97.) "As a matter of fact, he [wished] to go back to work and [requested] a written note from our clinic." (Tr. 297.) Dr. Sabharwal recorded his impression of Claimant's non-ischemic dilated cardiomyopathy as well compensated. (Tr. 295.) Dr. Sabharwal opined that Claimant could return to work because his cardiac condition was not a significant limiting factor. (Tr. 295.)

On January 5, 2007, Claimant was admitted to the emergency room as a result of left arm swelling. (Tr. 355.) Claimant was discharged with instructions to take Bactrim DS[10], to elevate his arm, and to follow-up with his primary care doctor. (Tr. 356.) On January 7, 2007, Claimant

_____

[10] Bactrim DS (Sulfamethoxazole and trimethoprim) are both antibiotics that treat different types of infection caused by bacteria. Drugs.com, Bactrim DS Information from Drugs.com, http://drugs.com/mtm/bactrim-ds.html

went to a follow-up with Dr. Al-Ashraf who prescribed him Keflex and instructed Claimant to go to the emergency room if he felt pain, swelling, or numbness. (Tr. 345.) On January 9, 2007, Claimant was treated for left upper arm extremity cellulitis[11]. (Tr. 342.) On January 18, 2007, Claimant went to his primary care physician, Dr. Al-Ashraf, for a left-arm cellulitis follow-up. (Tr. 342.) In his progress report, Dr. Al-Ashraf suggested that Claimant had a blockage in his vascular system rather than cellulitis and that Claimant should go to the emergency room if his swelling got worse, if he felt a shooting pain, or if his arm was more pale than normal. (Tr. 342.)

On May 16, 2007, Claimant went for a physical with Nurse Boxleitner. (Tr. 280.) Nurse Boxleitner noted that Claimant was very well functionally. (Tr. 280.) Claimant still had some shortness of breath concomitant with exertion that was made worse as a result of his asthma. (Tr. 280.) The nurse noted that Claimant's physical condition is unremarkable, notwithstanding his recorded weight of 269 pounds. (Tr. 278.) On May 22, 2007, Claimant went in for an evaluation, after his CPAP machine had malfunctioned, for untreated sleep apnea. (Tr. 276.) The examiner, Nurse Boxleitner, noted that Claimant had some dyspnea but was able to walk about two miles a day. (Tr. 274–76.) However, the nurse also noted Claimant had recurring snoring and witnessed apnea, and daytime sleepiness. (Tr. 274–76.)

On July 18, 2007, Claimant went in to the heart clinic for a follow-up evaluation. (Tr. 272.) Dr. Thappa noted Claimant was feeling good, his weight stable, and he had only used Lasex once over the past two months for swelling in his lower legs and belly. (Tr. 272.) Claimant was noted to have a history of alcohol abuse, but was currently not drinking. (Tr. 272.) Claimant

---

[11]Cellulitis is a spreading bacterial infection of the skin and tissues beneath the skin. MedicineNet.com, Cellulitis Skin Infection Information on Medicinenet.com, http://www.medicinenet.com/cellulitis/article.htm.

indicated that he walks half an hour per day and mows the lawn twice per week. (Tr. 272.) The report shows Claimant denied any palpitations, chest pain, PND, peripheral edema, syncope or claudication[12]. (Tr. 272.) Moreover, Claimant was positive for dyspnea with exertion, had history of asthma, sleep apnea, and was positive for hyperlipidemia. (Tr. 272.) Claimant was well compensated, showing no concerns with fluid, did not describe any concerns with shortness of breath, did not identify any concerns with bronchospasm as a result of the increase in Coreg. (Tr. 328.) The Claimant's blood pressure was well controlled. (Tr. 328.)

On August 16, 2007, Claimant underwent a sleep study. (Tr. 303.) The sleep study revealed Claimant had severe sleep apnea with oxygen de-saturation. (Tr. 303.) Application of a CPAP machine at 11 cm of water corrected his sleep disorder. (Tr. 303.) As a result, Vivek Thappa, M.D., recommended Claimant use a CPAP machine at 11 cm of water. (Tr. 303.)

On August 27, 2007, Dr. Sabharwal, performed a Medical Assessment of Ability to do Work-Related Activities upon Claimant. (Tr. 329.) Dr. Sabharwal noted Claimant's ability to lift and carry was limited as exertion caused shortness of breath and fatigue. (Tr. 329.) Dr. Sabharwal also noted that it was difficult for Claimant to maintain focus due to dizziness which had an effect upon hand manipulations. (Tr. 329.) Moreover, Claimant's ability to walk and stand were limited to two hours within an eight hour work day as a result of sleep apnea, asthma, dilated cardiomyopathy and pulmonary hypertension. (Tr. 329.) Claimant's maximum amount of time he could stand or walk was limited to fifteen minutes at a time. (Tr. 329.) Dr. Sabharwal also found it was necessary for Claimant to maintain elevation of his legs while seated at a

_____

[12]Claudication is pain and/or cramping in the lower leg due to inadequate blood flow to the muscles. MedicineNet.com, Claudication Information on Medicinenet.com, http://www.medicinenet.com/claudication/article.htm

height of at least six inches. (Tr. 330.) Claimant was found to never be able to perform postural activities such as climbing, balancing, stooping, crouching, kneeling or crawling. (Tr. 330.) It was also noted that Claimant had several environmental restrictions, which included the following: moving machinery, temperature extremes, chemicals, dust, noise, fumes. (Tr. 331.) Dr. Sabharwal noted that the limitations placed upon Claimant in this report had existed since August 2006. (Tr. 331.)

## V.     Standard of Review

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626

(7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.  Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a Claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. *Id.* The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

**VII.** <u>Analysis</u>

**A.** **Step One: Is the Claimant Currently Engaging in Substantial Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two. *See* 20 C.F.R. § 404.1520(a)(4).

In the present case, the ALJ reserved a finding as to whether the Claimant has engaged in substantial gainful activity. (Tr. 50.) In doing so, the ALJ stated, "The record need not be further developed on this issue, because the Claimant is found to be 'not disabled' for reasons unrelated to his work activity." (Tr. 50.) The Commissioner does not argue that Claimant engaged in substantial gainful activity. Neither party addresses the ALJ's decision to reserve her finding as to Step One.

A sequential analysis and determination of each step individually is required before moving on to the next step. 20 C.F.R. § 404.1520(a)(4). The Commissioner must determine whether the claimant is engaged in substantial gainful activity before moving on to the next step. *Id.*

In this case, the ALJ moved on to Step Two. In doing so, the ALJ needed to have found that Claimant was not engaged in substantial gainful activity. The ALJ's "reservation" of a Step One determination is invalid. Because the ALJ proceeded to Step Two, this court finds that

Claimant was not engaged in substantial gainful activity. This court also proceeds to Step Two accordingly.

**B.     Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

The ALJ found the Claimant to have the following severe impairments: dilated cardiomyopathy, pulmonary hypertension, sleep apnea, asthma, and obesity. (Tr. 51.) Neither party disputes this determination. As a result, the ALJ's Step Two determination is affirmed.

**C.     Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app.1. The Listings describe, for each of the body's major systems, impairments that are considered severe enough *per se* to prevent an individual from performing any significant gainful activity. 20 C.F.R. § 404.1525(a). The Listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing her Step Three analysis, the ALJ evaluated Claimant's symptoms under the following listings: 3.02, 3.03, 3.10 (as evaluated under section 3.09) 4.02, 4.04, and 4.05. (Tr. 51.) The ALJ determined that Claimant's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 51.) Neither party disputes the ALJ's decision. As a result, the ALJ's Step Three determination is affirmed.

**D.    Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return and perform past relevant work. 20 C.F.R. § 404.1520. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id*. Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

The ALJ should consider the following in addition to the objective medical evidence when assessing the credibility of a claimant's statements about his or her symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effect of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant

receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 1529(c).

"Past relevant work" is work previously performed by the claimant that constitutes substantial gainful activity and satisfies certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Social Security Ruling 82-62. If the RFC allows the claimant to return and perform past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

### 1.      Claimant's RFC Determination

In conducting the Step Four analysis, the ALJ determined Claimant's RFC to be the following: "the Claimant has the residual functional capacity to perform light work (sitting 6–8 hours and standing/walking at least 6 hours out of an 8-hour workday, and lifting 10 pounds frequently and 20 pounds occasionally), except that he must avoid concentrated exposure to unprotected heights, moving and hazardous machinery, pulmonary irritants, and temperature extremes." (Tr. 52.) The ALJ determined that Claimant's RFC prevents him from performing any past relevant work. (Tr. 57.)

### 2.      Evidence Relied Upon by the ALJ

In making her RFC and ability to perform past relevant work determination, the ALJ considered Claimant's testimony at the hearing concerning his symptoms. (Tr. 52–57.) Claimant testified that he did not feel that he was capable of performing past work because his legs swell up each time he stands up. (Tr. 53.) Claimant also testified that his asthma flares up when he is

exposed to fumes. (Tr. 53.)

Additionally, the ALJ considered Claimant's testimony concerning his use of medication. (Tr. 53.) The ALJ noted Claimant's testimony that he uses an inhaler every day for his asthma as well as a nubulizer during bad attacks. (Tr. 53.) The ALJ further noted Claimant's allegation that his use of the CPAP machine has reduced his day-time sleepiness and helped him sleep at night. (Tr. 53.) Additionally, the ALJ noted Claimant's testimony that he has been taking a water-pill and potassium for the swelling in his legs. (Tr. 53.)

Furthermore, the ALJ noted Claimant's testimony regarding his efforts to work after having an ICD implanted in him. (Tr. 53.) Claimant alleged that he had to abandon his attempts as his legs began to swell up with fluid and his breathing became labored. (Tr. 53.) Furthermore, the ALJ noted Claimant's testimony that some of his doctors advised him to lose weight; in response to this advice, Claimant testified that he has lost 24 pounds. (Tr. 53.) The ALJ further noted Claimant's weight on the date of the hearing was 260 pounds. (Tr. 53.) Claimant testified that he feels better since losing the weight. (Tr. 53.)

The ALJ mentioned Claimant's testimony that he had not gone to the emergency room since January 2007. (Tr. 53.) At the hearing, Claimant stated that he experiences back and leg pains every day, usually after sitting for too long. (Tr. 53.) The ALJ noted Claimant's testimony that, at the time of the hearing, he was not seeing any doctor for these pains, and that he does not take pain medication. (Tr. 53.) The ALJ also considered Claimant's testimony that he must elevate his legs six inches off the floor in order to reduce the swelling in his legs. (Tr. 53.) The ALJ noted that Claimant elevates his legs three times per day, for about 20–25 minutes. (Tr. 53.)

The ALJ also noted Claimant's testimony that he has trouble breathing after exertion.

(Tr. 54.) Claimant also stated that he has blurred vision which could be a side effect of one of the medications he is taking. (Tr. 54.) Claimant testified that he could walk for a few minutes, stand 15 minutes, and could probably lift 10–15 pounds, but that he has never actually tried. (Tr. 54.)

Moreover, the ALJ noted Claimant's testimony that he is able to cook simple meals, wash dishes, bath and dress himself, and go for walks. (Tr. 54.) The ALJ further noted Claimant is able to attend church every Sunday, so long as he gets up occasionally and stretches. (Tr. 54.) The ALJ also noted Claimant's testimony that he is able to travel to Joliet every three months in order to visit his children and grandchildren. (Tr. 54.) Claimant stated that he is picked up and driven home by his children. (Tr. 54.) The ALJ considered Claimant's testimony that his neighbor helps him with household chores as well as does his laundry. (Tr. 54.) The ALJ noted Claimant was unable to build or paint cars because he is unable to bend and cannot be around the fumes produced from the paint. (Tr. 54.) The ALJ also considered Claimant's testimony that his day ordinarily includes the following: making oatmeal in the morning, taking his medications, taking a walk on the porch and up the block, running errands, cooking lunch, and watching television or reading magazines. (Tr. 54.)

The ALJ also noted various medical evidence from the record. (Tr. 54.) The ALJ considered the medical progress notes from April 4, 2002 until June 29, 2007, from Crusader Clinic. (Tr. 54.) The progress notes indicate Claimant was observed throughout this period for conservative management of his various conditions, including the following: chronic lower back pain, right leg and foot weakness, hypertension, dermatitis, and left arm edema. (Tr. 54.) These medical progress notes indicate that Claimant's asthma, hypertension and congestive heart failure were all clinically stable with prescribed treatment, and that his weight had gradually

increased from 254 to 280 pounds. (Tr. 54.) The ALJ further noted the January 7, 2007 report

from Crusader Clinic. (Tr. 54.) The report indicates Claimant was prescribed antibiotics for

swelling in his arm that occurred after Claimant fell in his bath tub.(Tr. 54.) The ALJ also

considered a January 9, 2007 report that Claimant was admitted to the hospital with left upper

extremity cellulitis. (Tr. 54.) While at the hospital, Claimant underwent an echocardiogram

which showed left ventricular hypertrophy by M-Mode measurements, but with improved LV

function, with the probable range of ejection fraction being between 45 and 50 percent, with no

significant valvular abnormalities. (Tr. 54.) The ALJ noted a January 15, 2007 report that

Claimant underwent a venous Doppler study that showed no evidence of deep vein thrombosis.

(Tr. 54.) Consequently, Claimant received treatment and was discharged with no restrictions and

in stable condition. (Tr. 54.) The ALJ noted that Claimant was given Zyvox 600 mg, Advair

100/50, Albuterol inhaler, Coreg 6.25 mg, Lisinopril 20 mg, Singulair 10 mg, Digoxin .25 mg,

Spironolactone 12.5 mg, and Tylenol 500 mg. (Tr. 54.) Claimant's progress notes on May 10,

2007 indicate a history of asthma, with merely daytime persistent mild symptoms. (Tr. 54.)

The ALJ also relied upon medical records ranging from October 14, 2003 until August

16, 2007, from SwedishAmerican Health System. (Tr. 54.) The ALJ further considered a January

2004 report by Dr. Sabharwal that noted Claimant had non-ischemic dilated cardiomyopathy,

was currently on Coreg 12.5 mg, and his condition appeared to be relatively compensated. (Tr.

54.) The ALJ additionally noted a March 2004 report by Dr. Sabharwal which states that

Claimant was doing quite well on his current medical treatment; Claimant denied any worsening

shortness of breath, orthopnea or chest discomfort. (Tr. 55.)

The ALJ also considered a September 13, 2004 report which indicates Claimant appeared

to be relatively well compensated with no symptoms of congestive heart failure, and he denied any significant limitations in his daily activities. (Tr. 55.) The ALJ noted a September 29, 2005 report which indicates that Claimant went in for a routine follow-up visit with Dr. Sabharwal. (Tr. 55.) In this report, Dr. Sabharwal recorded that Claimant did not express that he was experiencing any worsening symptoms and that Claimant denied any complaints of chest discomfort or major limitations in his daily activities. (Tr. 55.) Additionally, Dr. Sabharwal recorded that Claimant was well compensated, however, he was being referred for evaluation of a potential ICD implant, secondary to his left ventricular dysfunction. (Tr. 55.)

The ALJ further considered an October 17, 2005 report where Claimant was evaluated by E. Andrew Telfer, M.D. (Tr. 55.) Dr. Telfer asserted that Claimant was then a functional heart class I to II, and an appropriate candidate for a non-thoracotomy defibrillator. (Tr. 55.) Dr. Telfer initiated Claimant on spironolactone 12.5 mg. (Tr. 55.) The ALJ noted outpatient heart management progress notes from December 16, 2005, which indicated Claimant had been diligent in using his CPAP machine every night in order to treat his sleep apnea. (Tr. 55.) The ALJ further noted a December 19, 2005 Muga rest study which displays that Claimant had normal wall motion, and an ejection fraction of 59 percent. (Tr. 55.) The ALJ also considered a December 23, 2005 report that Claimant had an x-ray taken. (Tr. 55.) The x-ray shows Claimant was stable with mild prominence of the left ventricle and mildly atherosclerotic aorta. (Tr. 55.) The ALJ noted that on December 28, 2005, Dr. Telfer implanted Claimant with a left VVIR ICD defibrillator. (Tr. 55.) The ALJ also noted records from a January 6, 2006 follow-up visit which indicate Claimant was doing well; Claimant's weight was down to 264 ¾ pounds, and he was working as a cook. (Tr. 55.)

Additionally, the ALJ considered an outpatient heart management progress note from February 14, 2006. (Tr. 55.) The progress report indicates that Claimant's weight was down, that his hypertension was well controlled, that his asthma and renal function were stable, and that he was complaining of a poor energy level, but he denied any orthopnea, heart palpitations, chest pain, or dizziness. (Tr. 55.) The report also indicates that Claimant was working nine-hour shifts as a cook, and that he had requested a note indicating his need for some short breaks throughout the day; Claimant alleges that he occasionally becomes winded while working due to not having adequate rest periods. (Tr. 55.)

The ALJ further relied upon an April 17, 2006 report that Claimant had lost his job. (Tr. 55.) The report noted that Claimant's weight had increased to 265 ½ pounds, and that he was experiencing some exertional dyspnea with moderate activity. (Tr. 55.) However, the report also indicates that Claimant denied any dizziness, fatigue or peripheral edema. (Tr. 55.)

The ALJ noted a June 12, 2006 report which indicates Claimant continued to have shortness of breath with activity but his overall condition and energy level was stable. (Tr. 55.) The report also indicates that Claimant stated that he had been walking about one mile daily, as well as performing yard work and household chores without any limitations. (Tr. 55.) Furthermore, the report reflected Claimant's weight to be 270.2 pounds. (Tr. 55.) However, Claimant was active, and appeared stable with no asthma concerns. (Tr. 55.) Claimant's renal function was stable and his hypertension was under control. (Tr. 55.)

The ALJ also considered a September 2006 progress report that reflects Claimant was exercising and walking up to three miles per day, and that he was looking for potential employment. (Tr. 55.) Claimant denied any shortness of breath concomitant with activity, chest

discomfort, dizziness, or fatigue. (Tr. 55.) Claimant's pacemaker check-up came back as unremarkable. (Tr. 55.)

Moreover, the ALJ considered an October 2, 2006 progress report that shows Claimant was doing exceptionally well. (Tr. 55.) The report indicates that his hypertension, renal function, and asthma, were all well controlled. (Tr. 55.) The ALJ noted a December 14, 2006 progress report created by Dr. Sabharwal that shows Claimant was well compensated. (Tr. 55.) Claimant was not having any significant chest discomfort or limitations in his daily activities. (Tr. 55.) Dr. Sabharwal asseverated, from a cardiac standpoint, that Claimant had no significant limiting factors and that he could return to work. (Tr. 56.)

The ALJ considered a May 16, 2007 report that indicates, that functionally, Claimant was doing very well. (Tr. 56.) The report also indicates that Claimant had missed or cancelled several follow-up appointments over the previous five months. (Tr. 56.) Claimant's physical examination yielded unremarkable results notwithstanding his recorded weight of 269 pounds. (Tr. 56.) The ALJ also considered a May 22, 2007 report. The report indicates that Claimant had been consistently using his CPAP machine until six months ago. (Tr. 56.) Without his CPAP machine Claimant found it difficult to sleep. (Tr. 56.) Moreover, Claimant reported some exertional dyspnea; however, he was still able to walk roughly two miles per day. (Tr. 56.) Claimant's examining doctor indicated that Claimant had obstructive sleep apnea and recommended a sleep study evaluation. (Tr. 56.)

The ALJ also considered Claimant's July 18, 2007 cardiac progress report. (Tr. 56.) The report evinces that Claimant had used Lasiz only once over the previous two months and that it was used only on rare occasions of swelling in his lower legs and abdomen. (Tr. 56.) Claimant

denied any history of arthritic symptoms or back problems. (Tr. 56.) Claimant had a history of alcohol abuse, but was no longer drinking. (Tr. 56.) The notes indicate Claimant walked 30 minutes daily and mowed the lawn twice per week. (Tr. 56.) The notes indicate Claimant's physical examination was unremarkable notwithstanding Claimant's recorded weight of 268 pounds. (Tr. 56.) Claimant's treating physician listed Claimant's cardiac condition as well compensated. (Tr. 56.) Claimant expressed no concerns regarding shortness of breath, and his blood pressure and heart were indicated to be under control. (Tr. 56.)

The ALJ also noted the results of an August 16, 2007 sleep study which shows that Claimant had severe sleep apnea with oxygen de-saturation. (Tr. 56.) As a result, it was recommended that Claimant use a CPAP machine. (Tr. 56.) The ALJ also considered an August 27, 2007, physical capacity assessment of Claimant. (Tr. 56.) The results of the assessment indicate Claimant is limited to sitting, standing, and/or walking a maximum of two hours in an eight-hour day for no longer than 15 minutes at a time. (Tr. 56.) Claimant must elevate his legs at least six inches, while seated for up to six hours. (Tr. 56.) Claimant must never perform postural activities such as climbing, balancing, stopping, crouching, kneeling, or crawling. (Tr. 56.) Moreover, the report indicates that Claimant is prohibited from being exposed to moving machinery, temperature extremes, chemicals, dust, noise and fumes. (Tr. 56.)

**3.      The ALJ's Step Four Determination is Supported by Substantial Evidence in the Record.**

In coming to her RFC determination, the ALJ exhaustively reviewed and considered the reports created by Claimant's doctors. The objective medical evidence of record, including reports by Dr. Sabharwal, Dr. Telfer, Dr. Thappa, Dr. Silva, Dr. Al-Saraf, and Nurse Boxleitner, substantially supports the RFC determination accepted by the ALJ. The ALJ's RFC

determination is consistent with the ALJ's findings that Claimant's RFC testimony and his subjective pain symptoms are not credible. Furthermore, the ALJ's RFC determination is consistent with her finding that Dr. Sabharwal's opinion evidence is not credible. *See Diaz v. Chatter* 55 F.3d 300, 307 (7th Cir. 1995).

In making her RFC determination, the ALJ rejected the RFC determination of Dr. Sabharwal, a specialist in cardiology and Claimant's treating physician, and accepted the RFC determination of the state agency physician. (Tr. 57.) Under the federal regulations, generally the courts give more weight to the opinion of an examining physician. 20 C.F.R. § 15.27. Similarly, the federal regulations generally give more weight to the opinions of a specialist regarding medical issues in his or her area of specialty. *Id.* However, generally, the regulations also give more weight to an opinion that is more consistent with the record as a whole. *Id.* In this case, the ALJ justified her decision to disregard Dr. Sabharwal's opinion, by noting inconsistencies between Dr. Sabharwal's own treatment notes and his residual functional capacity determination. (Tr. 57.)

For example, on December 14, 2006, Dr. Sabharwal opined in his report that Claimant can return to work as his cardiac condition is not a significant limiting factor. (Tr. 295.) Then, on August 27, 2007, Dr. Sabharwal changed course, opining that Claimant's cardiac condition, *inter alia,* limited the duration Claimant could work to a total of two hours per day. (Tr. 295.) This sudden change in Dr. Sabharwal's decision is not supported by the progress reports between December, 14 2006, and August 27, 2007. Furthermore, information contained within Dr. Sabharwal's treatment notes supports the ALJ's decision. (Tr. 57.) For example, Claimant stated to Dr. Sabharwal, that he was walking one to three miles daily. (Tr. 57.)

Next, the ALJ found that Claimant's testimony regarding his subjective pain symptoms was not credible. (Tr. 57.) In doing so, the ALJ gave significant weight to the objective medical evidence on record which is in conflict with the Claimant's testimony and in support of the ALJ's RFC determination. The ALJ's decision to discount Claimant's testimony is supported by substantial evidence on the record. Moreover, the ALJ's RFC determination is supported by substantial evidence on the record.

A December 8, 2005 report prepared by Dr. Telfer shows Claimant was working 40 hours per week. (Tr. 247.) A December 19, 2005 report documented by Dr. Silva shows Claimant had a stable chest with mild prominence of the left ventricle and mildly atherosclerotic aorta. (Tr. 235.) Moreover, a report prepared by Dr. Silva, showing the results of an x-ray, indicates that Claimant had normal wall motion and an ejection fraction of 59%. (Tr. 231.) Just one month before Claimant's alleged onset date, a January 6, 2006 report prepared by Nurse Boxleitner, indicates that Claimant was carrying heavy pots while currently working as a cook. (Tr. 255, 317.) Additionally, a June 12, 2006 report created by Nurse Boxleitner, reflects that Claimant was walking approximately one mile daily, and performing yard work without any limitations brought on by fatigue. (Tr. 307.) In August 2006, Dr. Al-Saraf noted in his report that Claimant is capable of performing low-exercise and low-duty jobs. (Tr. 349.)

Just one month later, a September 1, 2006 report created by Nurse Boxleitner, indicates that Claimant had increased the distance of his daily walks from one mile up to three miles without experiencing fatigue, dizziness or shortness of breath. (Tr. 304.) The report also reflects that Claimant was in the process of looking for work. (Tr. 304.) Moreover, on December 14, 2006, Dr. Sabharwal noted in his report, that Claimant could return to work and that his cardiac

condition was not a significant limiting factor. (Tr. 295.) The report also reflects that Claimant indicated that he wants to return to work. (Tr. 295.) Similarly, a July 18, 2007 report prepared by Dr. Thappa, shows that 17 months after Claimant's alleged onset date, Claimant was feeling good, that his weight was stable, and that he had only used his medication once over the past two months for swelling in his lower legs and belly. (Tr. 272.) The report also shows that Claimant was walking at least one half hour per day, and that Claimant was mowing his lawn two times per week. (Tr. 272.)

Next, Claimant's attorney makes two additional arguments. Claimant first argues that the ALJ was under a duty to "re-contact the doctor if there is any question as to his opinion." Claimant is correct that, under certain circumstances, the ALJ [should] contact the doctor in the event of inconsistencies or confusion; however, this is not one of those situations. 20 C.F.R. § 404.1527(c)(3).

Claimant also attempts to argue that the ALJ erred by adopting the opinion of the state agency physician who formulated his opinion prior to receiving 100 pages of medical evidence. This court finds that this argument is unpersuasive. The ALJ reviewed the entire record, that includes the additional 100 pages Claimant is referring too. (Tr. 52.) Hence, it is of no consequence that the state agency physician did not review the entire record so long as the ALJ did in fact take this evidence into consideration and her determination is supported by substantial evidence on the record. *See Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). Moreover, Claimant's argument that the ALJ failed to consider the aggregate effect of the entire constellation of Claimant's impairments is simply not supported by the record. The ALJ readily refers to Claimant's obesity in the same breath with Claimant's other impairments when she was

making her RFC determination. (Tr. 54.)

In the same regard, the ALJ's credibility determination regarding Claimant's testimony is sound. Claimant argues the ALJ's vague statements are hardly sufficient and that the ALJ cannot dismiss Claimant's allegations solely on the basis that they are not supported by objective evidence. However, Claimant is without support for his position as the case law cited is readily distinguishable from the present case. In *Carradine*, the Claimant was suffering from a psychological condition which subjectively caused his pain to be more acute. *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004). The present case involves no such condition. In fact *Carradine* supports the ALJ decision. *Id.* at 754 (stating that an ALJ determination that a claimant was exaggerating his pain symptoms would ordinarily be conclusive upon the court). Furthermore, an ALJ's credibility determination will not be reversed unless it is patently wrong. *Diaz* 55. F.3d at 307. Claimant points to no evidence rising to the standard articulated in *Diaz* that would compel this court to reverse the ALJ's credibility determination.

The ALJ's RFC determination is supported by substantial evidence in the record and the ALJ drew a logical bridge from that evidence to her RFC determination. Therefore, this court affirms the ALJ's RFC determination. *Id.*

The ALJ adopted the opinion of the vocational expert which found the Claimant unable to perform any of his past relevant work. (Tr.57.) Neither party disputes this finding. As a result, the court affirms the ALJ's Step Four determination.

**E.     Step Five: Does Any Other Work Exist in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

At step five, the Commissioner determines whether the Claimant's RFC and vocational

factors allow the Claimant to perform any job which exists in the national economy in significant numbers. 20 C.F.R. § 404.1560(c). The burden is on the Commissioner to provide evidence demonstrating other work exists. 20 C.F.R. § 404.1560(c)(2). In doing so the Commissioner considers the Claimant's RFC and vocational factors in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (the "Guidelines").

The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile. Social Security Ruling 83-11. The Guidelines represent exertional maximums, and if the Claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or exertional limitations. Social Security Ruling 83-12; 83-14.

If the Claimant has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision making. Social Security Ruling 85-15. A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy. *Overman v. Astrue*, 546 F. 3d 456, 2008 U.S. App. LEXIS 21016 at *18 (7th Cir. 2008).

The ALJ concluded that a finding of "not disabled" is appropriate under section 204.00 of the medical guidelines. (Tr. 58.) The ALJ based her decision on the testimony of the vocational expert. (Tr. 58.) The ALJ also considered Claimant's age, education, work experience, and residual functional capacity and the fact that Claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national

economy.

The ALJ noted that Claimant was born on August 6, 1954 making him 51 years old. (Tr. 57.) Claimant is defined as an individual closely approaching advanced age, on the alleged date of his disability onset. (Tr. 57.) The ALJ further noted that Claimant has at least a high school education and is able to communicate in English. (Tr. 58.) The ALJ found the transferability of skills is not material to the determination of disability, because the Medical-Vocational Rules support a finding that the Claimant is "not disabled," whether or not the Claimant has transferable job skills. (Tr. 58.); *see* Social Security Ruling 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2.

The ALJ found the Claimant's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." (Tr. 58.)  In order to determine the effect of these additional limitations upon the Claimant's ability to work, the ALJ asked the vocational expert (the "VE") to determine whether jobs exist in the national economy for an individual with the same age, education, work experience, and residual functional capacity as the Claimant. (Tr. 58.)

At the hearing the VE testified that an individual with the Claimant's RFC limitations could perform the duties required for food prep, mail clerk, courier and packer positions. (Tr. 38.) However, the VE expressed some doubt about whether an individual with Claimant's RFC limitations could perform the duties required of a light cook. (Tr. 38.) The VE also testified that, in the Northern Illinois area, there were approximately 3,700 mail clerk positions, 11,200 packer positions, 5,500 courier positions, and 2,500 light cook positions that existed.

In her opinion, the ALJ implicitly found 22,900 to be a significant number of jobs. (Tr.

37.) The ALJ also found the VE testimony to be consistent with the Dictionary of Occupational Titles and Selected Characteristics of Occupations. (Tr. 58.)

This court finds the ALJ drew a logical bridge from the evidence of record to her conclusion. Therefore, the ALJ's decision is based upon substantial evidence on the record and this court affirms the ALJ's Step Five Determination.

**VIII.** <u>**Conclusion**</u>

For the foregoing reasons, the Commissioner's motion for summary judgment is granted and Claimant's motion for summary judgment is denied.

**ENTER:**

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: August 4, 2010**